1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

CONSEJO DE SALUD PLAYA DE PONCE, et.al.

     Plaintiffs

        v.

JOHNNY RULLAN, SECRETARY OF HEALTH OF THE COMMONWEALTH OF PUERTO RICO

     Defendant

**CIVIL NO. 06-1260 (GAG)**

**AND**

**CIVIL NO. 06-1524 (GAG)**

**(CONSOLIDATED)**

<u>**OPINION AND ORDER**</u>

      In this case the plaintiffs, three federally qualified health centers, seek injunctive relief from the Court ordering the Secretary of Health of the Commonwealth of Puerto Rico to issue to them prospective Medicaid "wraparound" payments, pursuant to 42 U.S.C. § 1396 a(bb) (5).  <u>See</u> <u>Plaintiffs' Motion in Compliance . . . and Renewed Motion for Preliminary Injunction</u> (Docket No. 127); <u>see also</u> <u>Consejo de Salud Playa Ponce v. Pérez Perdomo</u>, 556 F. Supp. 2d 76 (D.P.R. 2008) (<u>Opinion and Order of June 4, 2008 denying defendant's motion for summary judgment</u> (Docket No. 99)).

      The Secretary of Health, represented by the Attorney General of the Commonwealth, nonetheless contends that the Medicaid "wraparound" statute, as applied to Puerto Rico, is unenforceable.  He argues that the statutory provision violates the Constitution's Spending Clause, U.S. Const. Art. I § 8, cl. 1, insofar as the numerous amendments to the Medicaid statute have significantly altered the way the program works.  At the time the Commonwealth elected to participate in the Medicaid program it could not have foreseen the devastating economic consequences resulting from statutory directives it is now unable to comply with.  <u>See</u> <u>Defendant's Opposition to Plaintiffs' Motion for Renewed Preliminary Injunction</u> (Docket No. 133) at 24-26.

      The Secretary further argues that Puerto Rico cannot be treated by Congress in a manner disparate to the States.  Following the passage by Congress of Law 600 in 1950, and subsequently Law 447 in 1952, Puerto Rico enacted its own Constitution, thus obtaining the degree of autonomy

and independence normally associated with the States of the Union.  Consequently, Supreme Court jurisprudence treating Puerto Rico disparately from States premised on the *Insular Cases* doctrine is anachronistic and, thus, no longer applicable.  Id. at 26-28.

The court certified these constitutional challenges to the Attorney General of the United States, noting that the federal government's position would be essential to the court's ruling.[1]  See 28 U.S.C. § 2403; Fed. R. Civ. P. 51(b).  The court also afforded the parties time to further address these issues which are clearly dispositive of the merits of the injunctive relief sought.  See *Orders* of October 2, 2008 (Docket Nos. 135 and 136).  The Attorney General duly responded to the Court's certification order (Docket No. 144), as did the plaintiffs (Docket No. 148).[2]

Before addressing plaintiffs' contentions, however, it is essential to first provide some background on the Medicaid "wraparound" statute as it pertains to Puerto Rico.

### I.      *The Medicaid Wraparound Statute and its Applicability to Puerto Rico*

The Medicaid program, 42 U.S.C. § 1396 *et. seq*., begun in 1965, is jointly supported with federal and state funds and directly administered by state governments.  Its purpose is to provide medical assistance to indigent families with dependent children, as well as indigent disabled, blind, and aged individuals.  Río Grande Community Health Center, Inc. v. Rullán, 397 F. 3d 56, 61 (1st

---

[1]   The court notes that the two consolidated cases at hand are presently not the only "wraparound" payment litigation cases in this district where these same constitutional issues have been raised.  See also Atlantic Medical Center, Inc. v. Commonwealth of Puerto Rico, 06-1291 (GAG) (Docket No. 398 at 24-27).

[2]  The Attorney General does not address the merits of the constitutional arguments.  Rather, he posits that the Commonwealth Secretary's challenge has been improperly raised, given that in the summary judgment context he did not present any constitutional arguments.  This is correct. However, the arguments raised by the Secretary in his summary judgment motion focused on whether the Commonwealth as a matter of fact was in compliance with the federal statute at issue. Now the plaintiffs have moved for preliminary injunctive relief and the Commonwealth, in turn, has raised the constitutional arguments as a defense.  This is certainly not improper given that the Court must now consider evidence as to each of the four requisites necessary for an injunction to issue, to wit, (i) plaintiffs' likelihood of success on the merits, (ii) the potential of irreparable harm to plaintiffs, (iii) the effect of an injunction to defendant, and, (iv) the effect of an injunction to the public.  See Boston Duck Tours LP v. Super Duck Tours, LLC, 531 F. 3d 1,11 (1st Cir. 2008).

Cir. 2005).  The Commonwealth of Puerto Rico is a "state" for purposes of the Medicaid statute, 42 U.S.C. § 1301; Río Grande, 397 F. 3d at 61.

A state need not participate in the Medicaid program.  However, once it opts to do so, it must comply with all federal requirements.  The Commonwealth of Puerto Rico opted to participate in the Medicaid program. Id. at 61-62.

One requirement of the Medicaid program, relevant here, is that participating jurisdictions must provide federally-qualified health center services.  42 U.S.C. §§ 1396 a (a)(10)(A); 1396d (a)(2) (C); Río Grande, 397 F. 3d at 61.  Plaintiffs here are "federally-qualified health centers" ("FQHCs") operating in Puerto Rico, which receive grants under Section 330 of the Public Health Service Act and serve  medically underserved areas.  42 U.S.C.§ 254b.

Federal law regulates how FQHCs receive payment of services provided to Medicaid patients.  Río Grande, 397 F. 3d at 61.  Effective January 1, 2001, Congress established a new payment system  known as the "Prospective Payment System" ("PPS").  42 U.S.C. § 1396a (bb) (2)-(3); Río Grande, 397 F. 3d at 61.  Applying a mathematical formula set by the statute, each participating jurisdiction was initially required to make a baseline calculation for Medicaid reimbursement to FQHCs.  The initial calculation was to take into account FQHC data from 1999, 2000 and 2001.  Each subsequent year each jurisdiction has to prospectively revise its data for that particular year's FQHC Medicaid reimbursements.  Id. at 61-62.

In Puerto Rico, as in some other jurisdictions, FQHC reimbursement is greatly complicated. This is so because the Commonwealth employs a managed care approach for the operations of its Medicaid system.  Id. at 62.  The Commonwealth contracts with managed care organizations (MCOs) to arrange for providing medical services to Medicaid patients.  Id. It then pays a monthly fee to each MCO.  However, if a MCO does not own hospitals or clinics it must subcontract with FQHCs in order to provide Medicaid services.  Id.

The underlying problem leading to the filing of this action arises in the following manner. When the MCO contract with a FQHC gives the FQHC less compensation than it is supposed to receive under the PPS system, the jurisdiction must make a supplemental "wraparound" payment to the FQHC.  This "wraparound" payment will make up for the difference the FQHC is owed.  42

**Civil No. 06-1260 and 06-1524 (GAG)**        4

U.S.C. § 1396a(bb) (5); Río Grande, 397 F.3d at 62, 74.

Contrary to the States, Puerto Rico receives but a fraction of Medicaid monies from the federal government.  See 42 U.S.C. § 1308 (setting a cap on the amount of Medicaid funds U.S. territories receive in a fiscal year); Consejo de Salud Integral de Loiza, Inc. v. U.S. Department of Health and Human Services, 538 F. Supp. 2d 139, 141 (D.D.C. 2008).   Notwithstanding, the Commonwealth is required by federal law to comply with the statutory wraparound scheme just as if it were a state.  The result is that in the case of Puerto Rico's "wraparound" payment obligations, substantial amounts of Medicaid monies granted to the States by the federal government are unavailable.  These extra sums, in the millions of dollars, must then necessarily come from the Commonwealth fisc.  For example, in a state, Medicaid matching occurs on a fifty-fifty (50-50) basis.  In Puerto Rico it is on a twelve-eighty eight (12-88) basis, the Commonwealth having to provide the unevenly greater amount.  Consejo de Salud Integral de Loiza v. Pérez Perdomo, 479 F. Supp. 2d 247, 250 (D.P.R. 2007).

**II.        *Overview of the Constitutional Issues Presented***

The unequal and discriminatory fiscal treatment given to Puerto Rico by the Medicaid wraparound scheme is conspicuous and egregious.  More so, it is not an isolated incident of the federal government disparately treating Puerto Rico and the nearly four million United States citizens living in or moving to this territory, insofar health and welfare benefits are concerned.  See, e.g., Supplemental Security Income Program of the Social Security Act, 42 U.S.C. § 1381 *et. seq*. (only applicable to United States citizens residing in the fifty states and the District of Columbia); Aid to Families with Dependent Children Program, 42 U.S.C. § 601 *et. seq.* (providing lower level of aid to families with dependent children reimbursement to Puerto Rico).

Under the *Insular Cases* doctrine, only fundamental constitutional rights extend to unincorporated United States territories, whereas in incorporated territories all constitutional provisions are in force.  Balzac v. Puerto Rico, 258 U.S. 298 (1922).  In Balzac, the Court determined that Puerto Rico was an unincorporated territory.  Thus, in order for the Spending Clause protections to apply to Puerto Rico, Congress must have subsequently incorporated the territory.

**Civil No. 06-1260 and 06-1524  (GAG)**      5

Otherwise, the Clause would not apply because it is not the source of any fundamental rights.[3]  See Downes v. Bidwell, 182 U.S. 1 (1900) (holding that Article I, § 8 cl. 1 of the Constitution did not apply to Puerto Rico).[4]

In an unincorporated United States territory Congress can also discriminate against the territory and its citizens so long as there exists a rational basis for such disparate treatment.  Califano v. Torres, 435 U.S. (1974); Harris v. Rosario, 446 U.S. 651 (1980).  Contrariwise, in an incorporated territory, just as in a state, heightened constitutional scrutiny will apply.

The Court's analysis of the issues presented, thus, must necessarily commence by determining whether Puerto Rico remains an unincorporated territory, or if Congress, on the other hand, post-Balzac, incorporated the territory.

**III.**      ***At Present, Does the United States Constitution Extend Fully to Puerto Rico?***

This case resuscitates the paramount issue of the relationship of Puerto Rico, and the nearly four million United States citizens who reside therein, to the United States Constitution.  Following one hundred ten (110) years of uninterrupted United States sovereignty over Puerto Rico, does the doctrine of territorial incorporation, established in the early twentieth century by judicial fiat in the *Insular Cases*, continue to permit the constitutionally disparate treatment of the island and its inhabitants?

At the very outset, the court must note that the issue now before it is not that of the future political status of the island.  Rather, it is one involving the sacrosanct constitutional rights of United States citizens in a territory of the United States.  Does the Constitution today extend in full to

---

[3] The First Circuit has assumed that the Spending Clause applies to Puerto Rico.  See Nieves-Márques v. Puerto Rico, 353 F.3d 108, 128 (1st Cir. 2003).  This case, however, did not squarely involve the issue of whether the clause extended to Puerto Rico.  Rather, it involved a claim by the plaintiffs that the Commonwealth, by accepting federal educational funding, had waived its Eleventh Ammendment immunity, and thus, could be sued under the Individuals with Disabilities Education Act (IDEA) in federal court.  The court, in finding for the plaintiff, noted that "Congress may attach conditions to the receipt of federal funds pursuant to its Spending Clause power."

[4] Downes involved the Constitution's Uniformity Clause rather than the Spending Clause.  However, both provisions stem from Article I, § 8 cl. 1.

**Civil No. 06-1260 and 06-1524  (GAG)**        6

Puerto Rico?  Or, does the Constitution still permit Congress to continue treating this United States territory, as well as its citizens, disparately from stateside jurisdictions and United States citizens therein?[5]

### (i)        *The Insular Cases in Puerto Rico's Unique Historical Perspective*

In 1898 the American Nation extended from the Atlantic to Pacific Oceans.  In the aftermath of the Spanish-American War the United States expanded overseas both east and westward.  Upon the signing of the Treaty of Paris the United States acquired from Spain the territories of Guam and the Philippines in the Pacific, and Puerto Rico in the Atlantic.  *Treaty of Peace*, December 10, 1898, U.S. - Spain, 30 Stat. 1754.  Article IX of the Treaty provided that "the civil rights and political conditions of the natural inhabitants of the territories hereby ceded shall be determined by Congress."  That very same year, the United States by way of treaty also annexed the Republic of Hawaii as a territory.  See Joint Resolution to Provide for Annexing the Hawaiian Island to the United States, Res. No. 55, 55th Cong., 30 Stat. 750 (1989).

From 1901 - 1905, the Supreme Court in a series of opinions known as the *Insular Cases* held that the Constitution extended *ex propio vigore* to the territories.  Boumediene v. Bush, __ U.S. __,128 S. Ct. 2229 , 2254 (2008) (citing De Lima v. Bidwell, 182 U.S. 1 (1901); Dooley v. United States, 182 U.S. 222 (1901); Armstrong v. United States, 182 U.S. 243 (1901); Downes v. Bidwell, 182 U. S. 244 (1901); Hawaii v. Mankichi, 190 U.S. 197 (1903); Dorr v. United States 195 U.S. 138 (1904)).[6]  However, the Court in these cases also established the doctrine of territorial incorporation.  Id. Under the same, the Constitution only applied fully in incorporated territories such as Alaska and

---

[5]   The nearly four million (4,000,000) United States citizens residing in Puerto Rico are comprised of (i) persons born in the island, who are natural born U.S. citizens by birth, (ii) U.S. citizens born in the States who have moved to the island, as well as (iii) naturalized U.S. citizens now living on the island.  Throughout this opinion these U.S. citizens will be collectively referred to as "Puerto Ricans".

[6]   See also Goetze v. United States, 182 U.S. 221 (1901); Huss v. New York and Puerto Rico S.S. Co., 182 U.S. 392 (1901); Rasmussen v. United States, 197 U. S. 516 (1905).

Hawaii,[7] whereas it only applied partially in the new unincorporated territories of Puerto Rico, Guam and the Philippines.  For example, in De Lima, Armstrong, Downes, and Dooley, the Court determined that the Uniformity Clause, U. S. Const. Art. I § 8 cl. 1, which provides that "all Duties, Imposts and Excises shall be uniform throughout the United States", did not apply to Puerto Rico. The Court's *ratio decidendi* for this then-novel judicial distinction,[8] was illustrated in Downes:

> It is obvious that in the annexation of outlying and distant possessions **grave questions will arise from differences of race, habits, laws and customs of the people,** and from differences of soil, climate and production, which may require action on the part of Congress that would be quite unnecessary in the annexation of contiguous territory inhabited only by people of the same race or by scattered bodies of native Indians.

182 U.S. at 282 (emphasis added).  The Downes opinion "evidences the racism and Filipinophobia of the times".  Juan R. Torruella, The Insular Cases: The Establishment of a Regime of Political Apartheid, 29 U. Pa. J. Int'l. L. 307 (2007).

Following Spain's cession of the territories, a major insurrection broke out in the Philippines, lasting from 1899 - 1902.  Over four thousand American soldiers lost their lives, and nearly three thousand were wounded in the conflict.  Chambers, The Oxford Guide to American Military History 550 (1999 Ed.).  The racist sentiment of the period against the Filipinos was thus extended by the

---

[7] See Rasmussen and Mankichi, respectively.

[8] Up to the time the Supreme Court decided the *Insular Cases*, the doctrine of territorial incorporation  had only been the subject of debate in Harvard Law School's academic circles.  See Simeon E. Baldwin, The Constitutional Questions Incident to the Acquisition of Government by the United States of Island Territories, 12 Harv. L. Rev. 393 (1899); C.C. Langdell, The Status of Our New Territories, 12 Harv. L. Rev. 365 (1899); Abbott Lawrence Lowell, The Status of Our New Possessions: A Third View, 13 Harv. L. Rev. 155 (1899); James B. Thayer, Our New Possessions, 12 Harv. L. Rev. 464 (1899);  Carman F. Randolph, Constitutional Aspects of Annexation, 12 Harv. L. Rev. 291 (1890).  Baldwin, a Yale Law professor and co-founder of the American Bar Association, for example, was of the opinion that it would perhaps be unwise "to give to the half-civilized Moros of the Philippines, or the ignorant and lawless brigands that infest Puerto Rico the benefits of the Constitution".  12 Harv. L. Rev. at 401.  However, he understood that once the Treaty of Paris was ratified by Congress and the new territories annexed to the United States, the Constitution *in toto* would apply to the insular possessions.  Id. Thayer, a professor of law at Harvard, opined that "America [should not] forget her precedence of teaching nations how to live" and that the Constitution did not apply in the territories. 12 Harv. L. Rev. at 466.

Court to all other recently acquired Spanish territories.[9]  With the exception of two of its members, all justices of the Court that decided the *Insular Cases* had in 1896 also joined the Court's decision in <u>Plessy v. Ferguson</u>.[10]  Torruella, <u>supra</u> at 300-301.

The *Insular Cases* doctrine, as applied to Puerto Rico, made no common sense and was quite contrary to the reality of the island at this time.  In 1899 the Carroll Commission, appointed by President McKinley to personally study the conditions of the island, concluded that the existing governmental structure and laws of Puerto Rico need not be abrogated, superseded, revolutionized nor recast, but only reorganized or amended.  <u>See</u> Henry K. Carroll, <u>Report on the Island of Porto Rico</u> 59 (1899).  The Commission's Report further concluded that "[Puerto Ricans] knew pretty well what the rights and privileges of American citizenship were" and had the capacity of self

---

[9]  Among some members of the United States Congress, this racist sentiment was no secret, as evidenced by statements made while on the Floor of both Chambers.  Congressman Spight of Mississippi opined that the Filipinos and Puerto Ricans, who were Asiatics, Malays, negroes and of mixed blood "have nothing in common with us and centuries cannot assimilate them . . . They can never be clothed with the rights of American citizenship nor their territory admitted as a State of the American Union".  33 Cong. Rec. 2105 (1900).  Senator Bate of Tennessee expressed similar sentiment as to Puerto Ricans: "beware of those mongrels of the East, with breath of pestilence and touch of leprosy.  Do not let them become part of us with their idolatry, polygamous creeds and harem habits."  <u>Id.</u> at 3616.

[10]  On September 12, 1901, President McKinley died, after being shot days earlier during his visit to the Exposition of Pan-American Trade in Buffalo, New York.  Vice President Theodore Roosevelt succeeded him as President.  Subsequently Justice Horace Gray, who had participated in deciding several *Insular Cases*, retired.  For President Roosevelt, the appointment of a new justice to fill the Supreme Court vacancy was unusually important.  The crucial and decisive factor for his selection of a candidate was that whoever was ultimately appointed necessarily had to be of the view that the *Insular Cases* were indeed the law of the land, and would thus, vote to uphold the same.  Three historians concur that Oliver Wendell Holmes' appointment to the Court came exclusively as a result of his adherence to Roosevelt's policy regarding the *Insular Cases*.  <u>See</u> G. Edward White, <u>Justice Oliver Wendell Holmes, Law and The Inner Self</u>, 298-301 (Oxford Univ. Press 1993); Liva Baker <u>Justice From Beacon Hill</u> 346-49 (Harper Collins 1991); Sheldon M. Novick <u>Honorable Justice - The Life of Oliver Wendell Holmes</u>, 234-237 (Little, Brown & Co. 1989).  Holmes joined the Court on December 8, 1902 and thereafter voted consistently and decisively in support of the *Insular Cases*.

government.[11]  Id. at 57.  Consequently, the Report recommended that the Constitution and Laws of the United States be extended to Puerto Rico.  Id. at 63.

The Carroll Report further recommended that Puerto Rico be provided with an organized government.  Id. at 63-64.  This indeed occurred before the Insular Cases were even decided.  In 1900 Congress established a civil government for Puerto Rico which provided for an elected legislature, and a governor and supreme court appointed by the President of the Untied States.  Foraker Act, 31 Stat. 77 (1900).  In the same legislation, Congress also established a United States District Court in the island, which would serve as successor to the federal Provisional Court already established by military order in 1899.  Baralt, A History of the Federal Court in Puerto Rico: 1899 - 1999 115 (2004).  The Foraker Act also created the office of Resident Commissioner to the United States.

In 1917 Congress granted Puerto Ricans United States citizenship.  It also provided for an enhanced, bi-cameral legislature, extended the jurisdiction and powers of the federal district court to include, among other matters, the naturalization of aliens in Puerto Rico, and provided a Bill of Rights.  All statutory laws of the United States, unless otherwise provided, would have the same force and effect in Puerto Rico as in the United States.  The District of Puerto Rico also became part of the First Circuit.  Jones Act, 39 Stat. 951 (1917) (codified as 48 U.S.C. § 737);[12] see also Baralt, supra at 219-224.  Notwithstanding the granting of United States citizenship to persons born in

_____

[11]  The contrary opinion of the Supreme Court, as well as that of congressional members and legal academics, to the effect that Puerto Ricans at the time were uncivilized barbarians evidenced extreme ignorance of the island's present condition and history.  At the time of Spain's cession of Puerto Rico, the residents of the island enjoyed Spanish citizenship and voting representation in the Spanish Parliament pursuant to the Spanish Constitution of 1876 and Autonomic Charter of 1897.  Puerto Rico also enjoyed what was at the time a modern legal system, which included penal and criminal procedure codes, a commerce code and a civil code.  The island had a judicial system,  with two levels of appeal, the highest court being the Territorial Audiencia, established in 1831 by Royal Decree.  The Audiencia, upon the 1898 change of sovereignty became the Puerto Rico Supreme Court.  Baralt, A History of the Federal Court in Puerto Rico: 1899 - 1999 19-29, 46, 105 (2004).

[12]  The citizenship provision of the Jones Act is today codified at Section 302 of the Immigration and Naturalization Act, 8 U.S.C. § 1402.

Puerto Rico, and the presence of a federal court, the Supreme Court subsequently held that  the island remained an unincorporated territory.  Balzac v. Porto Rico, 258 U.S. 298 (1922).  The Court further held that in an unincorporated territory only "fundamental" constitutional rights extend to the jurisdiction and its citizens.  Id. at 312.

Balzac involved a criminal prosecution for libel, a misdemeanor under the Puerto Rico criminal code of the time.  The defendant requested a jury trial claiming that the *Jones Act* entitled him to this Sixth Amendment guarantee.  The Supreme Court of Puerto Rico denied his request, and following a trial, a judge found him guilty on two counts.  On appeal to the Supreme Court his conviction was affirmed.  The Court held that the granting of United States citizenship to residents of the island did not entitle a criminal defendant to full constitutional rights:

> What additional rights did [the Jones Act] give then?  It enabled them to move into the continental United States and becoming residents of any State there to enjoy every right of any other citizen of the United States, civil, social and political.

> In Porto Rico, however, the Porto Ricans can not insist upon the right of trial by jury, except as his own representatives in his legislature shall confer it on him.  The citizen of the United States living in Porto Rico can not there enjoy a right of trial by jury under the federal Constitution, any more than the Porto Rican.  It is locality that is determinative of the application of the Constitution, in such matters as judicial procedure, and not the status of the people who live in it.

Balzac, 258 U.S. at 308-09.  The Court further held that:

> The jury system needs citizens trained to the exercise of the responsibilities of jurors.  In common-law countries centuries of tradition have prepared a conception of the impartial attitude jurors must assume.  The jury postulates a conscious duty of participation in the machinery of justice *which it is hard for people not brought up in fundamentally popular government at once to acquire .  One of its greatest benefits is in the security it gives the people that they, as jurors, actual or possible, being part of the judicial system of the country, can prevent its arbitrary use or abuse.  Congress has thought that a people like the Filipinos or the Porto Ricans, trained to a complete judicial system which knows no juries, living in compact and ancient communities, with definitely formed customs and political conceptions*, should be permitted themselves to determine how far they wish to adopt this institution of Anglo-Saxon origin and when . . . We cannot find any intention to depart from this policy in making Puerto Ricans American citizens, explained this is by the desire to put them as individuals on an exact equality with citizens from the American homeland, to secure them more certain protection against the world, and to give them an opportunity, should they desire, to move into the United States proper and then without

Civil No. 06-1260 and 06-1524  (GAG)        11

naturalization to enjoy all political and other rights.

Id. at 310-11 (emphasis added).  Finally, the Court concluded that the organization of a federal court in the island was not evidence that Congress intended to incorporate Puerto Rico.

> "The United States District Court is not a true United States court established under Article 3 of the Constitution to administer the judicial power of the United States therein conveyed.  It is created by virtue of the sovereign congressional faculty, granted under Article 4, §3, of [the Constitution], of making all needful rules and regulations respecting the territory belonging to the United States".

Id. at 311-12.

As was the case with the original *Insular Cases*, the Balzac decision made no common sense and again showed extreme racism as well as ignorance of the realities of the island at the time.[13] "[The] assertion that somehow Puerto Ricans were incapable of understanding 'the responsibilities of jurors' and 'popular government' is without any basis in the record or the facts."  Torruella, supra at 326.  The Court further ignored that since 1899 civil and criminal jury trials had been conducted in Puerto Rico's federal court, in which federal law was applied.  Id. Moreover, since 1901, Puerto Rico's own criminal courts conducted jury trials in felony cases pursuant to the criminal code, now tailored after that of California.  Id. at 327.  Also, as noted earlier, by the time Balzac was decided, Puerto Rico had for over twenty years enjoyed an organized civil government established by Congress itself in the *Foraker* and *Jones Acts*.  This government, in principle, mirrored that of the federal government and the States: a governor, a bicameral legislature, a Supreme Court, and a federal district court, as well as a representative in Congress.[14]  In addition, Puerto Rico residents were now United States citizens.  Most ironic, for purposes of naturalization of aliens, Section 4 of

---

[13] The Court described Puerto Rico as a *"distant ocean communit[y] of a different origin and language from [that] of our continental people."* Id. at 311.

[14]  The previous system of government established under the Spanish Regime in the 1897 Autonomic Charter was in every sense as sophisticated as that under American sovereignty.  The island was governed by an insular parliament, consisting of two chambers, and by a Governor-General, who would appoint his cabinet.  Municipal organization was also compulsory for every population group exceeding more than one thousand inhabitants.  See P.R. Laws Ann. tit. I Historical Documents.

the *Jones Act* counted residency in Puerto Rico in the same manner as residence elsewhere in the United States.  Any fears that Puerto Rico — a civil law jurisdiction — at the time could not become incorporated to the American common law system, were totally unfounded.  Louisiana, also a civil law jurisdiction,  was acquired from France in 1803, and subsequently became a State of the Union in 1812, notwithstanding its civil code which remained in effect.

It was not until thirty four years later, in Reid v. Covert, 354 U.S. 1 (1957), when the Supreme Court again expressed itself in regards to the *Insular Cases*.  This case involved spouses of American servicemen, who lived on military bases in England and Japan.  Both wives,  civilians, had murdered their husbands and were tried and convicted before military courts.  They contended that they were entitled to indictment by grand jury and trial by jury because the provisions of the Fifth Amendment apply to American citizens tried outside of the United States.  The Court agreed with the petitioners, concluding that as United States citizens they were entitled to the protections of the Bill of Rights, notwithstanding that they committed crimes in foreign soil.  The Court then proceeded to distinguish Reid from the Insular Cases:

> The "Insular Cases" can be distinguished from the present cases in that they involved the power of Congress to provide rules and regulations ***to govern temporarily territories with wholly dissimilar traditions and institutions***.

354 U.S. at 14 (emphasis added).

Two decades later, the Supreme Court began to recognize the application to Puerto Rico of several Constitutional protections contained in the Bill of Rights.  In its opinions, the Court, without elaborating, relied on Downes and Balzac as precedent for the application of these constitutional rights.  See, e.g., Examining Board of Engineers, Architects and Surveyors v. Flores de Otero, 426 U.S. 572, 600 (1976) (Equal Protection); Torres v. Puerto Rico, 442 U.S. 465, 469 (1979) (Fourth Amendment); Posadas de Puerto Rico v. Tourism Co., 478 U.S. 328, 331 n.1 (1986) (First Amendment).[15]  Contrariwise, in Califano v. Torres, 435 U.S. 1 n.4 (1978) (*per curiam*), the Court relied on Downes and Balzac to justify the outright denial of Supplemental  Security Income to

_____

[15]  See also Trailer Marine Transport Corp. v. Rivera Vázquez, 977 F-2d 1, 7-8 (1st Cir. 1992) (holding that the dormant Commerce Clause applies to Puerto Rico).

1
2
3
4

United States citizens who had relocated to Puerto Rico from the States.  United States citizens within a United States territory could, thus, be discriminated against by the federal government so long as there existed a rational basis for such action, even though while previously living stateside they had enjoyed the now unavailable federal benefits.  Id..

5
6
7
8

Reference to the *Insular Cases* in the above cited opinions received considerable criticism from members of the Court.  In Torres, Justice Brennan wrote a concurring opinion, joined by Justices Stewart, Marshall, and Blackmun.  In the same, he noted that the present validity of the *Insular Cases* was questionable:

9
10
11
12
13
14

> Whatever the validity of [the *Insular Cases*], in the particular historical context in which they were decided, those cases are clearly not authority for questioning the application of the Fourth Amendment - or any other provision of the Bill of Rights - to the Commonwealth of Puerto Rico in the 1970s.  As Justice Black declared in Reid v. Covert: "neither the cases nor their reasoning should be given any further expansion.  ***The concept that the Bill of Rights and other constitutional protections against arbitrary government are inoperant when they become inconvenient or when expediency dictates otherwise is a very dangerous doctrine and if allowed to flourish would destroy the benefit of a written Constitution and undermine the basis of our government***".

15

442 U.S. at 475-476 (emphasis added).

16
17
18
19
20

In Harris, supra, the Court in a succinct *per curiam* order, applied Califano, supra, to hold that a lower level of aid to families with dependent children to residents of Puerto Rico did not violate the Equal Protection Clause, because in U.S. territories Congress can discriminate against its citizens applying a rational basis standard.[16]  Justice Marshall, likewise, issued a staunch dissent, again noting that Puerto Ricans are United States citizens and that the *Insular Cases* are indeed

21
22

23
24
25
26
27
28

---

[16]  Applying Harris and Califano, one federal court of appeals has more recently held that United States citizens relocating to Puerto Rico and establishing residency therein lose their ability to vote in Presidential elections.  Pursuant to the Overseas Citizens Absentee Voting Act., 42 U.S.C. § 1973 ff-1 *et. seq.*, United States citizens who relocate to any foreign nation may continue to exercise their federal voting rights.  Such statute, however, is inapplicable to Puerto Rico because it is not a foreign country.  Congress, under Harris and Califano "may treat Puerto Rico differently from States so long as there is a rational basis for its actions" and "every federal program does not have to be extended to it."  Romeu v. Cohen, 265 F. 3d 118, 124 (2nd Cir. 2001).  Accordingly, a United States citizen who moves from New York to Irak or Cuba, for example, may continue to vote in Presidential elections.  That same citizen moves to Puerto Rico and loses his right to vote.

**Civil No. 06-1260 and 06-1524  (GAG)**        14

questionable.  Id. at 653-54:

> The Court suggests today, without benefit of briefing or argument, that Congress needs only a rational basis to support less beneficial treatment for Puerto Rico, and the citizens residing there, than is provided to the States and citizens residing in the States.  Heightened scrutiny under the equal protection component of the Fifth Amendment, the Court concludes, is simply unavailable to protect Puerto Rico or the citizens who reside there from discriminatory legislation, as long as Congress acts pursuant to the Territory Clause. Such a proposition surely warrants the full attention of this Court before it is made part of our constitutional jurisprudence.

The latest expression from the Supreme Court on the *Insular Cases* occurred on June 12 of this very year in Boumediene v. Bush, ___U.S.___, 128 S. Ct. 2229 (2008).  This case involved aliens detained as enemy combatants at the United States Naval Station in Guantanamo Bay, Cuba, who petitioned for writs of *habeas corpus*.  Guantanamo Bay is not formally part of the United States, and under the terms of the 1903 lease between the United States and Cuba, the latter nation retained ultimate sovereignty over the territory, while the former nation exercises complete jurisdiction and control.  Id. at 2251-52.   Based on the federal control over the Cuban property, the Court applied the *Insular Cases* to hold that the detained enemy combatants were entitled to the protection of the writ — a Constitutional provision not contained in the Bill of Rights.

The Court, in reaching its conclusion in Boumediene, made four crucial pronouncements regarding the *Insular Cases*.   First, citing Reid v. Covert, it recognized that the *Insular Cases* involved territories ***"with wholly dissimilar traditions and institutions"*** that Congress intended to govern only ***"temporarily"***.  128 S Ct. at 2255 (emphasis added).

Second, the Court, citing Justice Brennan's concurrence in Torres, supra,  held that ***"[i]t may well be that over time the ties between the United States and any of its unincorporated territories strengthen in ways that are of constitutional significance***.  Id. at 2255 (emphasis added).

Third, the Court recognized that fundamental Constitutional rights apply to detained enemy combatant aliens  in Guantanamo Bay, an unincorporated territory over which the United States has exercised jurisdiction or control for over 100 years.  Id. at 2258-59.

Finally, and most important, the Court held the following:

> Our basic charter cannot be contracted away like this.   The Constitution grants Congress and the President the power to acquire,

dispose of and govern territory, *not the power to decide when and where its terms apply*. Even when the United States acts outside its borders, its powers are not "absolute and unlimited" but are subject "to such restrictions as are expressed in the Constitution." Abstaining from questions involving forward sovereignty and territorial governance is one thing. *To hold the political branches have the power to switch the Constitution on or off at will is quite another.*"

Id. at 2259 (citation omitted) (emphasis added).

The Court's extremely recent pronouncements in Boumediene at this time require this Court, as asked by the Commonwealth Secretary, to reexamine whether Puerto Rico, after one hundred ten (110) years under the American Flag,  remains an unincorporated territory (as is Guantanamo Bay), or whether it has evolved beyond said stage.

### (ii)    Congressional Treatment of Puerto Rico From 1900 to the Present

Congress, in its 1900 and 1917 legislation, established in Puerto Rico a local government paralleling that of a state, with three branches of government, including a bicameral elected legislature.  A federal district court was also established in 1900.  The federal court operated just as the federal court of any other state, applying federal law in both civil and criminal proceedings with English as its official language.[17]  See *Jones Act* §§ 41, 42; *Foraker Act* § 34.  A Bill of Rights was made applicable to the island.  *Jones Act* § 2.  More so, since 1900, the Puerto Rico Supreme Court served in a capacity equal to that of state supreme courts.  See Report of the Governor of Puerto Rico 81 (May 1, 1901).  It is important to note that during this time, the governor, federal judges and Puerto Rico Supreme Court justices, were all appointed by the President of the United States.  See *Jones Act* §§ 12, 40, 41; *Foraker Act* §§ 17, 33, 34.  A number of  members of the Puerto Rico Supreme Court were American jurists from the Mainland.  During the early years of the Court, these judges incorporated Common Law principles to the jurisdiction's once purely civil law system.  See José Trías Monge, Puerto Rico, The Trials of the Oldest Colony in the World 57 (Yale Univ. Press

_____

   [17]  In 1899, the Carroll Commission concluded that Puerto Ricans would learn the English language, and that "[b]oth Spanish and English may be used side by side for years to come."  Report on the Island of Puerto Rico at 59.  The 1901 Governor's Report noted that at the time "The teachers of English are for the most part Americans."  Report of the Governor of Puerto Rico 50 (1899).

**Civil No. 06-1260 and 06-1524  (GAG)**        16

1997).[18]

It is important to note that during the same period Congress passed the *Foraker* and *Jones Acts*, it also enacted legislation directed to the Philippine Islands.  In 1902, Congress passed the Philippine Organic Act, Public Law No. 235, 32 Stat. 691 ("An Act *Temporarily* to Provide for the Administration of the Affairs of Civil Government in the Philippines Islands").  The Act created a Philippine Assembly, composed of lower and upper houses, to commence once the insurrection ended and a census was concluded.  It also provided a Bill of Rights and called for the appointment of two resident commissioners.  The judicial power would be vested in a Philippine Islands Supreme Court and courts of first instance.  **The Act, however, contrary to its Puerto Rico counterpart — the *Foraker Act* — did not establish a federal court.**

In 1916, Congress passed the Philippine Autonomy Act, which replaced the 1902 Organic Act.[19]  The Preamble to the Act provided:

> Whereas it was never the intention of the people of the United States in the incipiency of the war with Spain to make it a war of conquest or for territorial aggrandizement *whereas it is, as it has always been, the purpose of the people of the United States to withdraw their sovereignty over the Philippine Islands and to recognize their independence as soon as a stable government can be established therein* (emphasis added).

In this Act, Congress, eighteen (18) years after acquiring the Philippine Islands, expressly stated its intent to relinquish sovereignty over the territory.  The Act also created a Philippine Senate, which

---

[18]  Trías Monge, a legal scholar and former Chief Justice of the Puerto Rico Supreme Court notes at page 57 of his book that: "the American judges [of the Supreme Court] soon took the lead. As they were most familiar with the American law, such matters were normally left to them, and questions of civil law soon came under their control too — cases which they interpreted in the light of Anglo-American doctrine and practice.  ***Law was the area of Puerto Rican life first Americanized to the fullest degree***" (emphasis added).  Trías Monge further notes that the judges of the federal court did likewise: "Like his American colleagues on the Supreme Court of Puerto Rico, Judge William H. Holt tended to interpret civil law texts in the light of the common law . . . ***The federal court became for many years a powerful force in the drive toward cultural assimilation***" (emphasis added).

[19]  See Act of August 29, 1916, 39 Stat. 545 (codified at 48 U.S.C. § 1001 *et. seq.*); see also Springer v. Government of the Philippine Islands, 277 U.S. 189, 200 (1928).

replaced the upper legislative house. The Supreme Court and courts of first instance continued to perform the role set in the 1902 Organic Act. **Once again, contrary to Puerto Rico, no federal court was created for the Philippine Islands.  Nor did the Act confer U.S. citizenship to the Filipinos.**

While Congress was relinquishing its sovereignty over the Philippines, it was doing just the contrary in Puerto Rico.  One year following the passage of the Philippine Autonomy Act, Congress passed the *Jones Act*, which, most important, conferred U.S. citizenship to persons born in Puerto Rico.  The Act at Section 41 also extended the jurisdiction of the federal court to include the naturalization of aliens.

Following the Supreme Court's <u>Balzac</u> decision in 1922,  the insular attention of Congress focused not on Puerto Rico, but again  on the Philippines.  In December, 1932, Congress passed the Hare-Hawes-Cutting Act, 47 Stat. 761,  which would grant the Philippine Islands independence.  The bill was vetoed by President Hoover, but Congress overrode his veto in 1933.  The bill, however, was subsequently opposed by the Philippine Senate.  Subsequently, Congress in 1935 passed a new bill, the Tydings-McDuffie Act, Pub. L. No. 73-127, 48 Stat. 456, which established a "Commonwealth of the Philippines" for a ten-year transitory period, culminating in independence. On July 4, 1946, as scheduled, the Philippine Commonwealth status ended and the Republic of the Philippines was born.  Thus, the United States de-annexed the Philippine Islands forty eight (48) years after acquiring it as a territory.

Having granted the Philippines their independence, Congress once more shifted its attention to Puerto Rico.  In this Caribbean territory, instead of legislating towards eventual independence, that is de-annexation, Congress, pursuant to Article IX of the Treaty of Paris, continued to act, now with enormous vigor, in the opposite manner, that is,  towards greater annexation and incorporation.

In 1947, Congress first passed the Elective Governor Act, Pub. L. No. 80-362, 61 Stat. 770 (1947).  This allowed the residents of Puerto Rico to elect their own governor, within the governmental framework previously set by the *Foraker* and *Jones Acts*.  Up to this moment, under both Spanish and American control of the island, Puerto Ricans had never elected the island's governor.

Next, in 1950, Congress enacted Public Law 600, Act of July 3, 1950, 64 Stat. 319 (codified

Civil No. 06-1260 and 06-1524  (GAG)        18

at 48 U.S.C. 731 b *et. seq.*).  Said law provided federal statutory authorization for the citizens of

Puerto Rico to write their own constitution subject to Congressional approval.  Following the passing

of this Act, a local Constitutional Convention drafted a constitution for Puerto Rico and submitted

it to Congress for approval.  By means of Public Law No. 447, Act of July 3, 1952, 66 Stat. 327,

Congress approved the proposed Constitution with the exception of two Sections that it eliminated,

and two Amendments that it imposed.   See 98 Cong. Rec. at 5119-28, 5126-27, 6184-86, 8715

(1952).  The Preamble to the **congressionally-approved document** declared that:

> We, the people of Puerto Rico, in order to organize ourselves
> politically **on a fully democratic basis**, to promote the general
> welfare, and to secure for ourselves and our posterity the complete
> enjoyment of human rights, placing our trust in Almighty God, do
> ordain and establish this Constitution for the commonwealth which,
> in the exercise of our natural rights, **we now create within our union
> with the United States of America**.
>  In so doing, we declare:
>  The **democratic system is fundamental to the life of the Puerto
> Rican community**.
>  We understand that the democratic system of government is one
> in which the will of the people is the source of public power, the
> political order is subordinate to the rights of man, and the free
> participation of the citizen in collective decisions is assured.
>  ***We consider as determining factors in our life our citizenship
> of the United States of America and our aspiration continually to
> enrich our democratic heritage in the individual and collective
> enjoyment of its rights and privileges; our loyalty to the principles
> of the Federal Constitution***; the coexistence in Puerto Rico of the
> two great cultures of the American Hemisphere; our fervor for
> education; our faith in justice; our devotion to the courageous,
> industrious, and peaceful way of life; our fidelity to individual human
> values above and beyond social position, racial differences, and
> economic interests; and our hope for a better world based on these
> principles (emphasis added).

The approved Constitution of Puerto Rico provided a republican form of self government

for the island, identical to that of the States, as required by Congress.  Act of July 3, 1950 § 2.  In

addition, pursuant to the new Constitution, the elected governor of Puerto Rico would now appoint

the Justices of the Supreme Court.  P.R. Const. Art. V §8.  The federal court remained unaffected,

and continued to exercise its jurisdiction in a manner identical to that of federal courts in the States.

The very same year the Puerto Rico Constitution came into effect, President Truman

appointed Clemente Ruiz Nazario to be the first federal judge born in Puerto Rico.  Upon

confirmation by the United States Senate, Judge Ruiz Nazario took office on March 28, 1952, shortly

before Congress approved the new Constitutional regime.  Baralt, supra, 304-306.

1
2
3
4
5

　　　In 1961 Congress once again legislated to provide Puerto Rico with a judicial state-federal court structure equal to that of States.  At the time, the United States Court of Appeals for the First Circuit reviewed not only judgments of the federal district court, but those of the Puerto Rico Supreme Court as well.[20]  This changed with Public Law 87-189, 75 Stat. 417, which provided that review of Puerto Rico Supreme Court judgments would now be before the U.S. Supreme Court.

6
7
8
9
10
11
12
13
14

　　　In 1966 President Lyndon Johnson signed Public Law 89-571, 80 Stat. 764, which transformed the Article IV federal district court in Puerto Rico to an Article III Court.  **This Act of Congress was not conducted pursuant to Article IV of the Constitution, the Territorial Clause, but rather under Article III.**  This marks the first and only occasion in United States history in which Congress establishes an Article III Court in a territory other than the District of Columbia.  **From this moment on, judges appointed to serve on the Puerto Rico federal district court have been Article III judges appointed under the Constitution of the United States**.  Like their mainland brethren they are entitled to life tenure and salary protection.  Senate Report 1504 reveals the reason for the enactment of this Law:

15
16
17
18
19
20

> ***There does not appear any reason why the U.S. District Judges for the District of Puerto Rico should not be placed in a position of parity as to tenure with all other Federal Judges throughout our judicial system***.  Moreover, federal litigants in Puerto Rico should not be denied the benefit of judges made independent by life tenure from the pressures of those who might influence his chances of reappointment, which benefits the Constitution guarantees to the litigants in all other Federal Courts.  ***These judges in Puerto Rico have and will have the exacting same heavy responsibilities as all other Federal district judges and, therefore, they should have the same independence, security, and retirement benefits to which all other Federal district judges are entitled***.

21
22
23
24
25
26

See 1966 U.S.C.C.A.N. 2786-90 (emphasis added); see also Examining Bd. of Engineers Architects and Surveyors v. Flores de Otero, 426 U.S. at 595 n.26 ("The reason given for this [law] was that the Federal District Court in Puerto Rico 'is in its jurisdiction, powers, and responsibilities the same as the U.S. district courts in the (several) states'.").  This important change in the federal judicial

27
28

---

　　　[20]  The *Foraker Act* at Section 35 originally contemplated that appeals from the Puerto Rico Supreme Court be taken to the Supreme Court of the United States.  However, the *Jones Act* at Section 43, changed the practice, and appeals would first have to be taken to the First Circuit.

structure of the island was implemented not as a request of the Commonwealth government, but rather at the repeated request of the Judicial Conference of the United States.  See Senate Report No. 1504, 1966 U.S.C.C.A.N. 2786-90.

In 1978 Congress authorized several additional federal district judgeships in Puerto Rico, for a total of seven.  Pub. L. 95-486 (Oct. 20, 1978), 92 Stat 1629.[21]  With the exception of the District of Massachusetts, this number of judgeships is twice as much as that of the other Districts within the First Circuit, to wit, Rhode Island, New Hampshire, and Maine.  More so, it is also larger than that of many federal judicial districts within the States.[22]  In 1984 one of the judges of the federal district court, Chief Judge Juan R. Torruella, a native of the island, was appointed to serve in the United States Court of Appeals for the First Circuit.  See 130 Cong. Rec. 29291 (1984).  His, was one of the two  new seats created by Congress for the Court of Appeals.  See P.L. 98-353 § 201 (a)(1), 98 Stat. 333.  In 1994, he became the Chief Judge of said court, replacing Stephen Breyer who was appointed to the Supreme Court.

The several aforementioned Congressional acts evidence that Congress for over a century has not intended to govern, and in fact has not governed, Puerto Rico *"temporarily"*.  **To the contrary, the ties between the United States and Puerto Rico have significantly strengthened to the effect**

_____

[21]  Twice before Congress had increased the number of federal judgeships in Puerto Rico to two (2), and later to three (3).  See Baralt, supra at 335, 376.

[22]  To the present, eighteen (18) Article III judges, all from Puerto Rico, have been appointed since 1966 to sit in the federal district court in Puerto Rico.  This number is impressive, given the facts that these judges enjoy life tenure, and only two have died while in office.  The sequence of these appointments is as follows: Hiram Cancio (1966), Juan B. Fernández Badillo (1967), José V. Toledo (1970), Hernán Pesquera (1972), Juan R. Torruella (1974), Juan M. Pérez-Giménez (1979), Gilberto Gierbolini (1980), Carmen Cerezo (1980), Jaime Pieras, Jr. (1982), Raymond L. Acosta (1982), Héctor M. Laffitte (1983), José A. Fusté (1985), Salvador E. Casellas (1994), Daniel R. Domínguez (1994), Jay A. García-Gregory (2000), Aida M. Delgado-Colón (2006), Gustavo A. Gelpí, Jr. (2006), and Francisco Augusto Besosa (2006).  See Baralt, supra at 337-78, 341-42, 377-79, 381-83, 431-35, 447-56, 524-28, 628 n.45, 636 n.76.  A majority of these judges throughout the years, has sat by designation in the sister district courts of the First Circuit, as well as in the Court of Appeals for the First Circuit.  See 28 U.S.C. §§  292(a) and (b).  Contra Nguyen v. United States, 539 U.S. 69 (2003) (holding that a non-Article III federal judge from the Mariana Islands could not sit by designation in Ninth Circuit panel).

Civil No. 06-1260 and 06-1524  (GAG)      21

**that Puerto Rico's system of government and laws resembles that of a federated State of the Union, which necessarily includes U.S. citizenship and the presence of an Article III federal court**.

All federal laws, criminal and civil in nature, apply to Puerto Rico as they apply to the States, unless otherwise provided.  48 U.S.C. § 734; Trailer Marine Transport Corp., 977 F. 3d at 7.[23] Federal executive branch agencies have significant presence in Puerto Rico, just as in any state, for example, the U.S. Attorney, Federal Bureau of Investigation, Homeland Security, National Labor Relations Board, Federal Emergency Management Agency, Transportation Safety Authority, Environmental Protection Agency, Equal Employment Opportunity Commission, Internal Revenue Service, and Social Security Administration,  to mention a few.  The island's economic, commercial, and banking systems are integrated to that of the Untied States.  Residents of Puerto Rico pay full federal payroll taxes to finance Social Security and Medicare just as stateside residents. They also pay federal import and export taxes, as well as commodity taxes.  More so, federal employees, and individuals and corporations who do business with the federal government in the island also pay federal taxes.  The Postal System in Puerto Rico is that of the United States. Contrary to other territories, Puerto  Rico historically has formed part of  the customs and immigration territory of the United States.  Federal shipping, maritime, and air transportation laws are in effect in the island.  **This state of affairs exists in Puerto Rico just as in the States because the congressional and executive branches of the federal Government have so determined throughout the past eleven decades**.

Several Puerto Ricans have since 1961 been appointed by the President, upon the advice and consent of the Senate, to serve as United States Ambassadors to Venezuela, Spain, Costa Rica, Chile,

---

[23] Following the 1950 and 1952 legislation, only two district court decisions have held that a particular federal law, which does not specifically exclude or treat Puerto Rico differently, is inapplicable to Puerto Rico.  The more recent decision was vacated on appeal.  See United States v. Rios, 140 F. Supp. 376 (D.P.R. 1956) (refusing to apply the Federal Firearms Act to transactions solely within Puerto Rico); United States. v. Acosta Martínez, 106 F. Supp 2d 311 (D.P.R. 2000) (refusing to apply federal death penalty to Puerto Rico), rev'd 252 F. 3d 13 (1st Cir. 2001); cert. denied 535 U.S. 906 (2002).

the Dominican Republic, and the Republics of Mauritius and Seychelles.  This evinces the extreme trust the President and Congress have placed upon these individuals, who serve the vital function of acting as the representative of the United States in foreign nations.  Such trust, as is the case with Article III judges, can only be placed in the hands of  persons whom the President and Congress clearly understand are an integral part of the American Nation, and whose civic and patriotic values and principles guarantee they will uphold the Constitution and laws of the United States.  One only need be reminded that Benjamin Franklin served as U.S. Ambassador to France following the Declaration of Independence to see just how vital to the Nation such positions are.  **More so, U.S. Ambassadors, like Article III judges, are not appointed pursuant to the Territorial Clause, but rather under Article II, Section 2 of the Constitution**.

Finally, the Court also simply cannot ignore the fact that Puerto Ricans, upon annexation of the island,  have formed an integral part of the Nation's Armed Forces in all armed conflicts since the Philippines Insurrection.  In 1900 the Puerto Rico Regiment, U.S. Volunteers Infantry, comprised of U.S. officers and Puerto Rican recruits, consisted of 900 men.  The Regiment replaced the 700 regular U.S. troops sent to suppress the Philippines Insurrection.[24] The Oxford Guide to American Military History at 580.[25]  During World War I, 18,000 Puerto Ricans were drafted or enlisted in the U.S. Armed Forces.  Id.  During World War II, 65,000 Puerto Ricans served in the armed forces.  Id.  During the Korean War, over 60,000 Puerto Ricans served in the armed forces.  See Official Site for the Department of Defense Commemoration of the 50th Anniversary of the Korean War, http://Korea500.army-mil/history/factsheets/hispanic.shtml.  And, in the Vietnam War, over 48,000 Puerto Ricans served in the armed forces, 23,500 of which actually participated in the actual conflict.  The Oxford Guide at 580.  Thousands of  Puerto Ricans have also participated in both Gulf Wars.

Over 1,220 Puerto Ricans have honorably paid the ultimate price in the service and defense

---

[24]  Ironically, Puerto Ricans on the one hand were sent to combat the Filipinos, yet on the other hand treated in the *Insular Cases* exactly like the Filipinos.

[25]  Even during the Spanish-American war a myriad of Puerto Ricans participated as United States auxiliary troops.  The Oxford Guide at 580.

of the Nation.  General William W. Harris, Commander of the 65th Infantry Regiment during the Korean War, describes Puerto Ricans in the military as dedicated and loyal United States citizens: "*No ethnic group has greater pride in itself and its heritage than the Puerto Rican people.  Nor have I encountered any that can be more dedicated and zealous in support of the democratic principles for which the United States stands.  Many Puerto Ricans have fought to the death to uphold them*". A Tribute to Puerto Rican Veterans, Puerto Rico Herald (November 11, 1999).  Several Puerto Ricans have attained the rank of General or Admiral, which requires a Presidential nomination and Senate confirmation, as is the case of judges and ambassadors.  **Such appointments, also are not made pursuant to the Territorial Clause, but rather under the Constitutional provisions pertaining to the Nation's armed forces.  More so, the enlistment and participation of Puerto Ricans in the Armed Forces is not an exercise of Congress' territorial clause powers, but rather one under military and naval constitutional provisions.**  See U.S. Const. Art. I § 8 cl. 11, 12, 13, 14, 15, 16; Art. II § 2 cl.1.

Puerto Rico is today one of the jurisdictions with the largest *per capita* enlistment in the United States Armed Forces.  See Statement of Hon. Carlos Romero-Barceló, Resident Commissioner of Puerto Rico before the United States Senate Committee of Energy and National Resources (July 14, 1998):

> The American citizens in Puerto Rico are patriots who have risked life and limb for this democracy.  Since 1917, when [U.S.] citizenship was extended to the island's residents, more than 400,000 Puerto Ricans have served in the United States Armed Forces.  In fact, beginning with World War I, an estimated 197,000 Puerto Ricans have fought in every military engagement the country has faced during this century.  Forty eight thousand Puerto Ricans served in Vietnam and during the Korean conflict, the 61,000 troops sent to the front by Puerto Rico outnumbered the forces of 32 states in absolute numbers and were second only to Hawaii when measured on a *per capita* basis.

and Statement of Hon. Anabelle Rodríguez, Secretary of Justice for the Commonwealth of Puerto Rico during a News Hour interview on April 27, 2001 (http://www.pbs.org/newshour/bb/military /jan-june01/vieques_4-27.html):

> Well, let me, first of all state [. . .] that the people of Puerto Rico take very seriously the matters related to national defense, and we have done so throughout our history.  The people of Puerto Rico, our men and women, have fought among your lines and fought very hard.  *Per*

**Civil No. 06-1260 and 06-1524  (GAG)**        24

*capita*, Puerto Ricans are amongst the highest on the United States as it relates to volunteering in the armed forces, as it relates to dying in the battlefield, and as to receiving the Congressional medal of honor because of their bravery.

Finally, it is important to note that both Spanish and English are official languages of the Commonwealth of Puerto Rico.  See P.R. Laws Ann. tit. 1 § 59.  Both the Commonwealth and United States Anthems are always performed at every official act and ceremony of the Commonwealth Government.  See P.R. Laws Ann. tit. 1 § 39 a(a).  The United States and Puerto Rico flags fly side by side in all Commonwealth offices and dependencies.[26]  And, all federal holidays are observed in Puerto Rico.  See P.R. Laws Ann. tit. 1 § 71 *et seq.*

**(iii)      Puerto Rico No Longer Remains an Unincorporated Territory**

On July 28, 1898, just three days after the landing of American troops in Puerto Rico, General Nelson A. Miles proclaimed:

> In the prosecution of war against the kingdom of Spain by the people of the United States, in the cause of liberty, justice and humanity, its military forces have come to occupy the island of Porto Rico. ***They come bearing the banner of freedom inspired by noble purposes, . . . They bring you the fostering arms of a free people, whose greatest power is justice and humanity to all living within their fold*** . . . . They have come not to make war on the people of the country, who for centuries have been oppressed; ***but, on the contrary, to bring protection, not only to yourselves, but to your property, promote your prosperity and bestow the immunities and blessings of our enlightenment and liberal institutions and government.***

Annual Report of the Major General commanding the Army, Nelson A. Miles, Nov. 5, 1898, Messages, 1898-1899, at 31-32 (emphasis added).  Despite the judicial prophylaxis set by the *Insular Cases* during the early 1900s, Congress throughout the remainder of the twentieth century proceeded to make a reality General Miles' promise to the People of Puerto Rico.

At present, it would be preposterous and absurd for the Downes and Balzac Court to hold that "grave questions will arise from differences of race, habits, law and customs of the [Puerto Rican] people" or that Puerto Ricans are "living in compact and ancient communities with definitely formed

---

[26]  Since May 6, 1970, the Commonwealth flag has also been displayed along that of the United States in the United States District Court and all of its courtrooms.  See Baralt, supra at 384-385.

Civil No. 06-1260 and 06-1524  (GAG)        25

customs and political conceptions." Cf. Trailer Marine Transport Corp., 977 F. 2d at 8 n.4 (holding that legislation directed at Puerto Rico in 1900 and 1917, creates no inference relevant to present day constitutional conditions). **From a juridical perspective, the Puerto Rico of present is, thus, one which Congress, pursuant to Article IX of the Treaty of Paris, has chiseled in the very image and likeness of the United States system of government and laws, and in which an Article III federal court sits.  More so, for over ninety (90) years Puerto Ricans have been loyal  United States citizens.**

The Supreme Court that from 1901 - 1904 decided the Insular Cases was the very Court that decided Plessy v. Ferguson.  The doctrine of "separate but equal" established in said case was reversed in 1954 by Brown v. Board of Education.  Under Brown and subsequent civil rights legislation, comments regarding the annexation of Puerto Rico and its citizens, such as those made in the Harvard Law Review articles, the very Floor of Congress, and in the *Insular Cases* themselves, would constitute direct *prima facie* evidence of intentional discrimination based on race and ethnic origin.  The rationale behind the Insular Cases' abhorrent doctrine of "separate and unequal" is, thus, no longer constitutionally justified.  **"The continued vitality of the [Insular Cases and their progeny] represents a constitutional antediluvian anachronism that has created a *de jure* and *de facto* condition of political apartheid for the U.S. citizens that reside in Puerto Rico and the other territories."**  Torruella, supra at 347 (emphasis added).

Today in Guantanamo Bay — an unincorporated territory of the United States — the fundamental rights and guarantees of the United States Constitution apply to alien enemy combatants.  Puerto Rico simply cannot be compared to Guantanamo Bay in any sense.  Likewise, United States citizens residing in Puerto Rico can neither be compared to alien enemy combatants. **"[The] purpose of Congress in the 1950 and 1952 legislation was to accord to Puerto Rico the degree of autonomy and independence normally associated with a State of the Union."**[27]

---

[27] Thirty years earlier, the Court in Balzac presupposed that incorporation was an important step necessarily leading to statehood. 258 U.S. at 311. Obviously, the Court could not have foreseen the novel type of constitutional evolution Puerto Rico would undergo throughout the twentieth

Civil No. 06-1260 and 06-1524  (GAG)        26

Examining Board v. Flores de Otero, 426 U.S. 572, 594 (1976); see also Córdova & Simonpietri Ins. Agency Inc. v. Chase Manhattan Bank, 649 F. 2d 36, 40-41 (1st Cir. 1981) (noting that "prior to 1950 Puerto Rico's legal status was closer to that of a 'territory' than that of a 'state'," and that since 1952 "Puerto Rico's status changed from that of a mere territory to the unique status of Commonwealth. And the federal government's relations with Puerto Rico changed from being bounded merely by the territorial clause, and the rights of the people of Puerto Rico as United States citizens, to being bounded by the United States and Puerto Rico Constitutions, Public Law 600, the Puerto Rican Federal Relations Act and the rights of the people of Puerto Rico as United States citizens") (emphasis added).[28]

**Actions speak louder than words.  Although Congress has never enacted any affirmative language such as "Puerto Rico is hereby an incorporated territory," its sequence of legislative actions from 1900 to present has in fact incorporated the territory**.  The following chronological table evinces this.

| DATE | CONGRESSIONAL/ JUDICIAL EVENT | EFFECT |
|---|---|---|
| 1898 | Treaty of Paris | Puerto Rico, Guam, and the Philippine Islands are annexed as territories of the United States |
| 1900 | Foraker Act | A civil government is established in Puerto Rico.  The President appoints the governor and justices of the Puerto Rico Supreme Court.  A unicameral legislature is established in which its members are to be elected.  A resident commissioner to the United States is also to be elected.  A federal court is established.  The President appoints the federal judges.  All proceedings in federal court are to be conducted in English.  Mainland jurists in the Supreme Court and federal court incorporate common-law principles to the existing civil law system. |
| 1902 | Philippines Organic Act | A civil government is established in the Philippines similar to that in Puerto Rico.  However, no federal court is established in the Philippines. |

century.

---

[28] In his statement of approval of the Puerto Rico Constitution, Congressman McCormack, House Majority Leader, described Law 600 as "a new experiment; it is turning away from the territorial status; it is something intermediary between the territorial status and statehood." 98 Cong. Rec. 5128 (1952).

Civil No. 06-1260 and 06-1524  (GAG)       27

| DATE | CONGRESSIONAL/ JUDICIAL EVENT | EFFECT |
|---|---|---|
| 1901-1905 | Insular Cases are decided | The Constitution applies *ex propio vigore* to Puerto Rico, however, not all constitutional rights extend to unincorporated territories. |
| 1916 | Philippines Organic Act | Congress announces its intention to grant the Philippine Islands independence.  No federal court is established.  Filipinos are not granted United States citizenship. |
| 1917 | Jones Act | Puerto Ricans become United States citizens.   A bi-cameral legislature is established.  A bill of rights is provided for the island.  Power of the federal court is extended to include the naturalization of aliens.  Puerto Rico is assigned to the United States Court of Appeals for the First Circuit for both federal and Puerto Rico Supreme Court appeals. |
| 1922 | Balzac v. Porto Rico is decided | Puerto Rico continues to be an unincorporated United States territory.  Only fundamental constitutional rights apply. |
| 1935 | Tydings-McDuffie Act | Commonwealth of the Philippines is established as ten (10) year transitory status leading to independence. |
| 1946 | Philippines Independence | After 48 years as a United States territory, Congress relinquishes all power over the Philippines on July 4, 1946. |
| 1947 | Elective Governor Act | Puerto Ricans for the first time in over 400 years elect their own governor. |
| 1950 | Law 600 | Congress authorizes Puerto Rico to draft a Constitution. |
| 1952 | Law 477 | Puerto Rico Constitution is approved by Congress.  A republican form of Government is provided to the island in the same.  The governor shall now appoint the Justices of the Supreme Court. |
| 1952 | Appointment of Clemente Ruiz Nazario | The President appoints the first Puerto Rican to the federal court. |
| 1954 | Brown v. Board of Education decided | The doctrine of "Separate and Equal" violates Equal Protection. |
| 1961 | PL  87-189 | Appeals for the Puerto Rico Supreme Court are to be taken to the United States Supreme Court, just as in the States. |
| 1966 | PL  89-571 | An Article III Court is established in Puerto Rico.  Federal Judges shall now be Article III Judges, with life tenure and salary protection. |
| 1978 | PL  95-48 | Additional federal judgeships created for Puerto Rico, for a total of seven (7).  The District of Puerto Rico has more federal judges than Rhode Island, New Hampshire, and Maine. |
| 1984 | 78 Stat 333 | Additional seat created for the U.S. Court of Appeals for the First Circuit.  First Puerto Rican is appointed to the United States Court of Appeals with jurisdiction over Puerto Rico, Massachusetts, Rhode Island, Maine, and New Hampshire. |
| 1966-2008 | Article III Judge Appointments | Eighteen (18) Article III United States District have been appointed to sit in the District of Puerto Rico. |

Civil No. 06-1260 and 06-1524  (GAG)        28

| DATE | CONGRESSIONAL/ JUDICIAL EVENT | EFFECT |
|------|------|------|
| 1961-2008 | Ambassador Appointments | Puerto Ricans are appointed United States Ambassadors to seven (7) nations. |
| 1900-2008 | Service in United States Armed Forces and Military Appointments | Puerto Ricans have served an integral and significant role in the Armed Forces of the United States. They have participated in every United States conflict since the Phillipines insurrection of 1900. Over 400,000 Puerto Ricans have served in the armed forces. Several Puerto Ricans have reached the highest ranks in the military and many others have been decorated for their service to the Nation. Puerto Rico is one of the United States jurisdictions with the highest *per capita* enlistment in the United States armed forces. |
| 1917-2008 | United States Laws Apply to Puerto Rico | All United States laws apply to Puerto Rico (unless there is a Congressional exception). |

**Contrary to the Philippine Islands, where since 1916 Congress, pursuant to Article IX of the Treaty of Paris, announced and subsequently began to relinquish sovereignty, in the case of Puerto Rico it did exactly the contrary in exponentially increasing constitutional terms**. As such, the ties between the United States and Puerto Rico have strengthened in a constitutionally significant manner.  Boumediene, 128 S. Ct. at 2255.  Congress, thus, is no longer justified in treating Puerto Rico as an unincorporated territory of dissimilar traditions and institutions, when the Constitutional reality is otherwise.  Id.  It is the judicial branch that determines when and where the full terms of the Constitution apply.  Id. at 2259; see also Trailer Marine Transport Corp., 977 F. 2d at 8 n.4 (holding that the issue of extending the Constitution to Puerto Rico is for the courts to decide).  The Congressional incorporation of Puerto Rico throughout the past century has extended the entire Constitution to the island, and today entitles the territory and United States citizens thereof to full enjoyment of all rights and obligations under the Constitution.[29]

Let it be clear.  The court today is in no way attempting to overrule the *Insular Cases* as applied to the U.S. territories — only the Supreme Court can.  The court, rather, today holds that in

_____

[29]  There may be some limited exceptions to this norm, established not by congressional action, but by the very Constitution itself.  See, e.g. Igartúa de la Rosa v. United States, 417 F. 3d 145 (1ˢᵗ Cir. 2005), cert. denied 547 U.S. 1035 (2006) (holding that Puerto Rico is not a state within the meaning of Article II of the Constitution, therefore, may not choose presidential electors, and residents thereof have no constitutional right to participate in Presidential elections, absent statehood or a constitutional amendment).

the particular case of Puerto Rico, a monumental constitutional evolution based on continued and repeated congressional annexation has taken place.  Given the same, the territory has evolved from an unincorporated to an incorporated one.  Congress today, thus, must afford Puerto Rico and the 4,000,000 United States citizens residing therein all constitutional guarantees.  **To hold otherwise, would amount to the court blindfolding itself to continue permitting Congress *per secula seculorum* to switch on and off the Constitution**.[30]  Boudemiene at 2259.

## IV.   *Supplemental Briefing*

The Secretary's "*as applied to Puerto Rico*" constitutional challenge to the Medicaid "wraparound" statute is extremely serious and important to both the Commonwealth and United States governments.  The Spending Clause argument, as well as that under Equal Protection, deserve the Court's utmost thoughtful and careful attention.

Under the Spending Clause, the Commonwealth cannot knowingly accept conditions of the Medicaid statute which it was unaware of, or unable to ascertain.  See Arlington Central School Dist. Bd. of Ed. v. Murphy, 548 U.S. 291, 296 (2006).  More so, in this case, the Court must view the Medicaid statute from the perspective of a Commonwealth official who is engaged in the process of deciding whether the jurisdiction should accept Medicaid funds and the obligations that go with those funds.  Id.

Under the Equal Protection Clause, given Puerto Rico's status as an incorporated territory

---

[30] In enacting Law 600 Congress indicated that "*This Bill does not commit the Congress, either expressly or by implication, to the enactment of statehood legislation for Puerto Rico in the future.  Nor will it in any way preclude a future determination by Congress of Puerto Rico's ultimate political status.  The United States has never made any promise to the People of Puerto Rico, or to Spain from whom Puerto Rico was acquired, that Puerto Rico would eventually be admitted into the Union.*"  H.R. R. No. 81-2275 at 3 (1950), 1950 U.S.C.C.A.N. 2682, 2683.  Such statement tracks language in Balzac to the effect that if Congress ever intends to incorporate Puerto Rico so that it become a State, it shall do so "deliberately, and with a clear declaration of purpose".  258 U.S. at 311.  The issue of statehood for Puerto Rico is not before this court.  As mentioned at the outset of this opinion, *ante* at 5-6, the issue before the court pertains exclusively to civil rights and not status politics.  May Congress, by allowing Puerto Rico to remain in limbo between a mere territory and a state, indefinitely (versus "temporarily") preclude the Constitution from applying to the United States territory and citizens residing therein?  Boumediene is clear that it may not.  As Article IX of the Treaty of Paris recognizes, "civil rights" and "political conditions" are distinct concepts.

of the United States, a heightened level of scrutiny is available to protect the Commonwealth and its citizens from discriminatory federal legislation.  Cf. Harris v. Rosario, 446 U.S. at 654 (Marshall, J. dissenting) (noting that in an unincorporated territory this heightened level of scrutiny is unavailable).  Matters, however, are complicated because the Supreme Court has held that a State is not a person under the Fifth Amendment.  State of South Carolina v. Katzenbach, 383 U.S. 301, 323-24 (1966).  More so, a State does not have standing as the parent of its citizens to invoke this constitutional provision against the Federal Government, which is the ultimate *parens patriae* of every American citizen.  Id. at 324.  Notwithstanding, in the case at bar, the Commonwealth Secretary is not bringing an action against the federal government.  Contra Katzenbach.  Here, the Secretary is raising the Equal Protection argument in the context of preliminary injunctive relief.  The Court, thus, must balance not only plaintiffs' likelihood of success and the irreparable harm they may suffer, but also any effect an injunction may have on the Commonwealth and the United States citizens of Puerto Rico.  In this instance for example, the Secretary contends that the disparate Medicaid matching will have a devastating effect on the Commonwealth fisc.

At present, the Commonwealth's constitutional arguments are not fully developed, both legally and, more important, factually.  This may very well be a case in which the Commonwealth necessarily must present evidence in support of its contentions that the medicaid "wraparound" statute is unconstitutional as applied to Puerto Rico.

Accordingly, the Court shall allow the Secretary to file a supplemental brief on these issues.  If warranted, the Court shall schedule an evidentiary hearing at an adequate time and allow the Attorney General of the United States to intervene or otherwise participate.[31]

SO ORDERED.

In San Juan, Puerto Rico this 10th day of November, 2008.

*S/Gustavo A. Gelpí*
GUSTAVO A. GELPI
United States District Judge

---

[31]  The Attorney General has requested until December 2, 2008 to inform whether he will intervene.  This deadline is hereby approved.