IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

CONSEJO DE SALUD PLAYA PONCE, et. al

Plaintiffs

v.

JOHNNY RULLAN, SECRETARY OF HEALTH OF THE COMMONWEALTH OF PUERTO RICO

Defendant

CIVIL NO. 06-1260 (GAG)

06-1524 (GAG)

## OPINION AND ORDER

On November 18, 2008 the court held an evidentiary hearing[1] to determine whether the three Federally Qualified Health Center (FQHC) plaintiffs in this case met all four requisites for a preliminary injunction. This would entail ordering the Secretary of Health to issue prospective Medicaid "wraparound" payments to plaintiffs pursuant to 42 U.S.C. § 1396 a (bb). The court shall discuss its findings as to the four factors *seriatim*.

**Likelihood of Success on the Merits**

In its Opinion and Order of June 4, 2008, Consejo de Salud Playa Ponce v. Pérez Perdomo, 556 F. Supp. 2d 76 (D.P.R. 2008) (Docket No. 99), Order of October 2, 2008 (Docket No. 134), and Amended Opinion and Order of January 7, 2009 (Docket No. 178), the court previously found that plaintiffs had established a likelihood of success on the merits inasmuch as the Commonwealth is

---

[1] The transcript of the evidentiary hearing has been filed at Docket No. 169.

**CIVIL NO. 06-1260 (GAG)**                    2
     **06-1524 (GAG)**

unequivocally required under federal law to fully comply with the mandates of the Medicaid "wraparound" statute, just as any state. See also Concilio Integral de Salud de Loiza, Inc. v. Pérez Perdomo, ___ F.3d ___, 2008 WL 5206398, at *1 (1st Cir. 2008) (noting that the Commonwealth, through its Secretary of Health, has for many years now not fulfilled this legal obligation, except under the duress of injunctive orders).

**Irreparable Harm**

The plaintiffs at the evidentiary hearing presented evidence to the effect that they have not received wraparound payments since the commencement of this case. Tr. at 101-102, 108.[2] Two centers, Migrant and Gurabo, for example, have been able thus far to survive financially, however, have sustained a loss of approximately $300,000.00. Tr. at 129, 136. Their economic situation continues to worsen to the point that, if not remedied, they will be forced to take drastic steps soon. Ultimately, the centers may be forced to close their doors. Tr. at 15, 137. This certainly constitutes irreparable harm. See Río Grande Community Health Center, Inc. v. Rullán, 397 F.3d 56, 76 (1st Cir. 2005) (holding that it is not unreasonable to conclude that the lack of wraparound payments is a key cause of FQHC's financial woes).

---

[2] Throughout this litigation the plaintiff FQHCs and defendant have on multiple occasions attempted to agree as to any wraparound amounts due. Despite the court's repeated encouragement, the parties have remained at an impasse.

**CIVIL NO. 06-1260 (GAG)**          3
          **06-1524 (GAG)**

### Effect of an Injunction to the Commonwealth

Compliance with federal law will certainly have a significant impact on the Commonwealth's fisc.[3] The Health Department's limited state annual budget of $306,000,000.00 (Docket No. 183) is insufficient for it to continuously comply with multiple wraparound obligations.[4] Tr. at 175, 183-185, 193. Continued court-ordered wraparound payments will thus inevitably result in the Health Department having to close several facilities and lay off employees who regulate health and safety in the Commonwealth. Tr. at 193.

### Effect of an Injunction to the Public

An injunction will allow the FQHCs to continue operating and, thus, providing medical services to indigent, disabled, blind, and aged individuals who participate in the Medicaid program. If an injunction is not ordered, the centers will not be able to provide as many services (Tr. at 15), and eventually will be forced to shut their doors. The public will then have to seek those medical services elsewhere. The Commonwealth Secretary posits that if a FQHC closes, the attending public

---

[3] The court takes notice that the Commonwealth government's finances are currently in a precarious condition.

[4] Fourteen other FQHCs have before this court identical claims to those of plaintiffs herein. See Concilio de Salud Integral de Loiza, Inc. v. Pérez-Perdomo, 03-1640 (GAG) (two (2) FQHCs); Atlantic Medical Center, Inc. v. Commonwealth of Puerto Rico, 06-1291 (GAG) (twelve (12) FQHCs). These FQHCs, likewise, have not received prospective wraparound payments. The court intends to consolidate all cases eventually.

**CIVIL NO. 06-1260 (GAG)**            4
         **06-1524 (GAG)**

can be relocated immediately. Tr. at 201. Even if so, however, this will result in a change of not only the center, but also the doctors and other treating health professionals, who may have been successfully treating individuals for a considerable period.

More important, the issuance of an injunction will have the effect of upholding the Commonwealth's continued compliance with Medicaid law — thus fostering an important federal public health policy.

**Balancing of all the factors**

A weighing of all the factors heavily tilts the scale in favor of plaintiffs, therefore warranting the issuance of an injunction. To decisively weigh the effect of an injunction on the Commonwealth over all other factors would only sanction the continued non-compliance with federal law. See Concilio Integral de Salud de Loiza, Inc. v. Pérez Perdomo, __ F. 3d __, 2008 WL 5206398, at *7 (1st Cir. 2008) (holding that the calculation methodology provisions of § 1396 a (bb) are enforceable under Section 1983).

Accordingly, the court shall order the Commonwealth to comply with federal law by issuing prospective "wraparound" payments to plaintiff FQHCs. As the court stated in its recent order (Docket No. 179), it will appoint a Special Master to assist in the intricate task of calculating the precise amounts due in the most expedited manner possible. The court shall not enter the preliminary injunction at this time, but rather will await until the prospective amounts due to

**CIVIL NO. 06-1260 (GAG)**  5
         **06-1524 (GAG)**

plaintiffs are determined.

### Constitutionality of the Medicaid Wraparound Scheme under a Spending Clause Analysis

### The Insular Cases Doctrine Revisited

The Commonwealth argues that the Medicaid "wraparound" scheme, as applied to Puerto Rico, violates the Constitution's Spending Clause, U.S. Const., Art. I § 8, cl. 1.  It contends that if ordered to comply with the wraparound statute, the federal government must, in turn, be required to adequately fund Puerto Rico's Medicaid program.  The court agrees.   While the wraparound statute itself is a valid exercise of Congressional power, the Medicaid cap, which along with it applies to Puerto Rico, nonetheless, violates the Spending Clause.

The court, in its Opinion and Order of November 10, 2008, as amended, (Docket No. 155), Consejo de Salud Playa de Ponce v. Rullán, ___ F.Supp. 2d ___, 2008 WL 4850946 (D.P.R. 2008), analyzed the issue of whether the Spending Clause indeed applies to Puerto Rico.  The court noted that Puerto Rico, throughout its 110 year history under the U.S. flag, had evolved into an incorporated territory due to a series of increasingly significant Congressional actions.  The court also noted that the First Circuit has applied the Spending Clause in instances where the Commonwealth accepts federal funds and consequently waives its Eleventh Amendment immunity to suit in federal court.  E.g., Nieves-Márques v. Puerto Rico, 353 F. 3d 108, 128 (1st Cir. 2003).

 The Commonwealth points to Justice Harlan's dissent in Downes v. Bidwell to the effect

**CIVIL NO. 06-1260 (GAG)**        6
          **06-1524 (GAG)**

that "the Constitution follows the flag," therefore, argues that the court's incorporation analysis is unnecessary.  See Supplemental Brief of Commonwealth Attorney General Roberto J. Sánchez-Ramos, Docket No. 175 at 14, 29-38.[5]  Justice Harlan's portentous dissent, while arguably stating what the "supreme law of the land" ought to be, unfortunately is not the "law of the land," unless and until adopted by the present Supreme Court.  The court fully concurs with Justice Harlan's dissent (Attachment A hereto), however, is unable to overrule Supreme Court precedent, as already explained in its November 10, 2008 Opinion and Order (Docket No. 155), ___ F.Supp. 2d ___, 2008 WL 4850946, at *17 (D.P.R. 2008).  However, the court hereby makes some additional observations regarding the doctrine of incorporation which plainly demonstrate just how juridically illogical and impracticable the same is.

The Treaty of Paris mandates that <u>Congress</u> (and not the Supreme Court) shall determine the civil rights and political status of the then acquired territories and their inhabitants.  The Treaty as such never speaks about incorporation/unincorporation, a concept that was introduced via judicial fiat by the Supreme Court in the *Insular Cases* decided between 1901-1905.  In these opinions, the Court held that Alaska and Hawaii were incorporated while other United States territories were not.

---

[5] Attorney General Sánchez-Ramos served in said capacity until January 2, 2009, and has since then been substituted by Attorney General Antonio M. Sagardía.  His supplemental memorandum was filed on December 24, 2008, subsequent to the court's November 10, 2008 opinion and order.  The same contains elaborate arguments which were not raised initially in this case by the Commonwealth.

**CIVIL NO. 06-1260 (GAG)**          7
    **06-1524 (GAG)**

In the case of Hawaii, which was annexed in 1898, the Court <u>inferred</u> that the actual incorporation did not take place until two years later in 1900, when Congress "formally incorporated" the territory by establishing a territorial government via organic act. See <u>Territory of Hawaii v. Mankichi</u>, 190 U.S. 197, 210-11, 218 (1903). In the case of Alaska, the Court likewise <u>inferred</u> that the 1867 treaty with Russia incorporated the territory to the United States, even though there was no express declaration by Congress to do so. See <u>Rassmussen v. United States</u>, 197 U.S. 516 (1905).

Subsequently in <u>Balzac v. Porto Rico</u>, 258 U.S. 298, 311 (1922), the Supreme Court expanded its judicial fiat to hold that the incorporation of a territory is an important step leading to statehood. The Court further explained that incorporation is a step that must be taken by Congress deliberately, with a clear declaration of purpose, and not left a matter of mere inference and construction. This clearly contradicted the Court's very own precedent in <u>Rasmussen</u> and <u>Mankichi</u>, wherein the incorporation of Alaska and Hawaii was <u>inferred</u> from Congressional acts.[6] Though declared incorporated territories, statehood for Alaska and Hawaii did not come until 1959,[7] and it did not come automatically. In the case of Alaska, three plebiscites were held prior to its admission

---

[6] The court through this opinion has used the term "inferred" because Congress never expressed that Alaska and Hawaii were "incorporated" or otherwise.

[7] Alaska, thus, was an "incorporated territory" for nearly ninety (90) years, and Hawaii for nearly sixty (60) years.

**CIVIL NO. 06-1260 (GAG)**          8
          **06-1524 (GAG)**

to the Union, the final one sponsored by Congress.  See Public Law 85-58, July 7, 1958, 72 Stat. 2933.  In Hawaii, two statehood plebiscites were likewise held, the latter also being Congressionally sponsored.  See Public Law 86-3, March 18, 1959, 73 Stat. 4.  Thus, as a prerequisite to admission, Congress in both territories held a final plebiscite to determine whether admission to the Union was the will of the populace; in neither case did Congress unilaterally impose statehood as a necessary consequence of incorporation.[8]  Such Congressional legislative action erodes Balzac's proposition that incorporated territories are *ipso facto* bound for statehood.

In the case of the Philippines, the Court in Dorr v. United States, 195 U.S. 138 (1904) and Rasmussen contrariwise inferred that the islands were an unincorporated territory.  This occurred a decade before Congress expressly announced their eventual independence in the Philippines Autonomy Act, Act of August 29, 1916, 39 Stat. 545.[9]

Similarly, the Court in Downes v. Bidwell, 182 U.S. 244 (1901), used inference and its own

---

[8] Attorney General Sánchez-Ramos expresses his concern that, if Puerto Rico is deemed incorporated, the island's residents will be unable to determine their ultimate political future.  See Supplemental Memorandum, Docket 175 at 42-48.  This is incorrect as evidenced by the holding of Congressional plebiscites in Alaska and Hawaii prior to their joining the Union.

[9] On February 14, 1899, the same Congress that ratified the Treaty of Paris issued a Joint Resolution expressing that it was not the intent of Congress in ratifying the Treaty to annex and incorporate the Phillippines to the Untied States (while not mentioning Puerto Rico).  Cong. Rec., 55th Cong. 3d Sess. Vol. 32 p. 1847.  The Supreme Court, however, determined that such resolution had no effect in interpreting the Treaty of Paris.  The Diamond Rings, 183 U.S. 176 (1901).  Congress' attempt to initially define expressly the status of the Phillippines was thus rejected by the Supreme Court which five years later in Rasmussen and Dorr made that very determination itself!

**CIVIL NO. 06-1260 (GAG)**          9
          **06-1524 (GAG)**

view of national policy to conclude that Puerto Rico was not incorporated.  This view was later reaffirmed in <u>Balzac</u>.  In the case of Puerto Rico, Congress has never to date sponsored a statehood plebiscite.  However, analogous to Alaska and Hawaii, Congress has sought the approval of Puerto Rico's citizens to change the island's political condition, albeit not to a state.  In 1950 Congress approved Law 600, which afforded the island's voters a process for adoption of a local constitution.  This ultimately led to the establishment of the Commonwealth of Puerto Rico, under a republican form of government.  As noted in notes 27 and 28 of this court's opinion of November 10, 2008 (Docket No. 155), __ F.Supp. 2d ___, 2008 WL 4850946, at *16 (D.P.R. 2008), the Court in <u>Balzac</u> could not have conceived of a territorial constitutional development of such magnitude.

The Supreme Court's holding in <u>Balzac</u> to the effect that the Constitution does not fully extend to Puerto Rico because incorporation can only be accomplished by clear declaration of Congress is at irreconcilable odds with <u>Rasmussen</u>, <u>Mankichi</u>, <u>Dorr</u>, and <u>Downes</u> where the Court <u>inferred</u> respectively that Alaska and Hawaii were incorporated, and the Philippines and Puerto Rico were unincorporated.  More so, as stated earlier, the <u>Balzac</u> Court, at the time, could not foresee the evolving nature of Congressional attitude towards Puerto Rico.  "[T]he Puerto Rico of present is, thus, one which Congress, pursuant to Article IX of the Treaty of Paris, has chiseled in the very image and likeness of the United States system of government and laws, and in which an Article III federal court sits.  More so, for over ninety (90) years Puerto Ricans have been loyal United States

**CIVIL NO. 06-1260 (GAG)**            10
             06-1524 (GAG)

citizens." Opinion and Order of November 10, 2008, as amended, (Docket No. 155), ___ F. Supp. 2d ____, 2008 WL 4850946, at *15 (D.P.R. 2008).

Finally, the following territorial anomaly further illustrates the erosion and inadherence by Congress of Balzac's language to the effect that the incorporation of a territory will necessarily lead to statehood. When the "incorporated territory" of Hawaii became a state, a portion of it was segregated and not made part of the State of Hawaii. See Hawaii Statehood Act, P.L. 86-3 (1959). The result is that today, Palmyra Atoll, by virtue of Congressional action, is an unpopulated and unorganized, yet incorporated territory of the United States. Under the *ratio decidendi* of Balzac, this is not possible, given that Palmyra did not became a state, nor will ever likely become one. Ironically, however, the United States Constitution affords greater protections and rights to a citizen in Palmyra Atoll than in an unincorporated territory.[10]

**Spending Clause Analysis**

Under the Spending Clause, the Commonwealth cannot knowingly accept conditions of the Medicaid statute which it was unaware of, or unable to ascertain. See Arlington Central School Dist. Bd. of Ed. v. Murphy, 548 U.S. 291, 296 (2006). The court must view in this instance the Medicaid Statute from the perspective of a Commonwealth official who is engaged in the process of deciding

---

[10] The Department of the Interior, Office of Insular Affairs, has recognized Palmyra's anomalous incorporated status. See http://www.doi.gov/oia /Islandpages/ palmyrapage.htm.

**CIVIL NO. 06-1260 (GAG)**  11
06-1524 (GAG)

whether the jurisdiction should accept Medicaid funds and the obligations that go with those funds. Id.

In this case, the Commonwealth's Secretary of Health, the Honorable Doctor John V. Rullán[11] testified at the November 18, 2008 hearing that when Medicaid was extended to the island he would not have accepted the same knowing the disparity in funding to the island that exists today. Tr. at 179. Such disparity is truly unconscionable.

The Commonwealth today receives approximately three hundred million dollars ($300,000,000.00) in annual capped Medicaid funds. See 42 U.S.C. § 1308 (territorial cap). The states, however, receive approximately two billion dollars ($2,000,000,000.00) annually in Medicaid funds. Tr. at 178. To add insult to injury, Puerto Rico, under the Medicaid Wraparound Statute enacted in 2000, must match federal funds on a 12-88 basis, where 12 percent comes from federal monies and 88 percent comes from the state fisc. Tr. at 178-79. Mississippi, the poorest state, yet a jurisdiction with more resources than Puerto Rico, receives two billion dollars ($2,000,000,000.00) annually in Medicaid funds. Its wraparound matching is also 12-88. However, opposite to Puerto Rico, the 88 per cent is paid with federal monies while the 12 percent comes from the state fisc. Tr. at 177.

---

[11] Dr. Rullán also resigned his position on January 2, 2009, following the change in the Commonwealth administration.

**CIVIL NO. 06-1260 (GAG)**              12
**06-1524 (GAG)**

In sum, Puerto Rico, throughout the years, has seen its share of Medicaid funds proportionately stagnate in relation to the States because of the §1308 Medicaid cap.[12] To this, Congress imposed upon Puerto Rico the same Medicaid "wraparound" obligations that the States have,[13] however, has left the territory enormously underfunded for Medicaid wraparound purposes. This is like an adhesion contract where the fine print comes and sporadically increases years later.

The court is of the opinion that the Medicaid wraparound statute, as applied to Puerto Rico in conjunction with the Medicaid cap, does not withstand constitutional scrutiny under the Spending Clause. No reasonable Secretary of Health under the circumstances would have accepted Medicaid funds for Puerto Rico had he known that Puerto Rico — unlike the States — forty years later would have to comply with Medicaid obligations payable almost in the entirety out of the state fisc and without adequate federal funding.

**Certification to the Attorney General**

The court once more certifies this Opinion and Order, as well as that of November 10, 2008, as amended, (Docket No. 155), ___ F.Supp. 2d ___, 2008 WL 4850946 (D.P.R. 2008), to the

---

[12] From 2005-2008 both the Governor of Puerto Rico, the Honorable Aníbal Acevedo Vilá, and its Resident Commissioner, the Honorable Luis Fortuño, raised their voice at the national level denouncing this situation. See, e.g., Attachments B and C, respectively.

[13] In this respect, the First Circuit's conclusion that wraparound funds in Puerto Rico are in most part federal, must be reexamined. See Río Grande, 397 F. 3d at 76.

**CIVIL NO. 06-1260 (GAG)**          13
           **06-1524 (GAG)**

Attorney General of the United States, pursuant to 28 U.S.C. § 2403 and Fed. R. Civ. C. 51 (b). The Attorney General is hereby asked to respond to the following constitutional issues:

1. Does the Spending Clause apply to Puerto Rico and, if so, on what basis?

2. Assuming the Spending Clause applies to Puerto Rico, does the Medicaid wraparound statute, in conjunction with the Section 1308 cap, offend said Constitutional provision?

3. If a Spending Clause violation lies, what is the appropriate remedy?

The United States Attorney for this District shall immediately provide copy of this Opinion and Order to the Attorney General. Copy of the transcript of the November 18, 2008 hearing (Docket No. 169) shall also be provided.

The Attorney General shall have until March 15, 2009 to respond. His position in this case is essential for the court, if necessary, to provide an adequate remedy. More so, the court again notes that this is only one of several FQHC cases before the court, all of which present the same issues.

**SO ORDERED.**

In San Juan, Puerto Rico this 13th day of January, 2009.

*S/Gustavo A. Gelpí*
GUSTAVO A. GELPI
United States District Judge